# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| ANDREW CHIARAVALLO,<br>    Plaintiff,<br><br>v.<br><br>MIDDLETOWN TRANSIT DISTRICT, et al.,<br>    Defendants. | No. 3:18-cv-1360 (SRU) |

## **RULING ON MOTION TO DISMISS**

This case arises out of Andrew Chiaravallo's ("Chiaravallo") termination as the Administrator of Middletown Transit District (also known as "Middletown Area Transit" or "MAT"), which provides public transportation for the City of Middletown, Connecticut ("the City"). Chiaravallo alleges that the Mayor of Middletown, Daniel Drew ("Mayor Drew"), made various pre-termination defamatory remarks regarding Chiaravallo's purported mismanagement of MAT, which were later published in the media. He also alleges that Mayor Drew directed the MAT Board of Directors ("the Board") to terminate Chiaravallo under the threat of not renewing the City's contract with MAT and withholding the City's funding of MAT. Chiaravallo was subsequently terminated by the Board.

Based on those allegations, Chiaravallo commenced this lawsuit on August 13, 2018. *See* Compl. (Doc. No. 1). Chiaravallo asserts procedural due process claims (Counts Three through Nine) against the MAT and each member of the Board ("the MAT Defendants"). Chiaravallo also brings a procedural due process claim against Mayor Drew (Count One), as well as a defamation claim (Count Ten), an intentional interference with an advantageous business relationship claim (Count Eleven), and a false light invasion of privacy claim (Count Twelve). Lastly, Chiaravallo asserts a procedural due process claim against the City (Count Two).

The MAT Defendants moved to dismiss those claims on September 12, 2018. *See* Doc. No. 21. Mayor Drew and the City ("the City Defendants") filed a motion to dismiss on October 10, 2018. *See* Doc. No. 27. On February 25, 2019, I held a motion hearing and granted the MAT Defendants' motion to dismiss Counts Three through Nine[1] and took the City Defendants' motion under advisement. *See* Doc. No. 49. For the following reasons, the City Defendants' motion to dismiss is **denied**.

I. **Standard of Review**

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("[w]hile legal conclusions can provide the framework of a

---

[1] I ruled that Chiaravallo fails to state a plausible stigma-plus claim against the MAT and its Board. Specifically, I noted that there are no allegations in the complaint that any member of the Board made, ratified, or adopted any statement that calls into question Chiaravallo's good name, reputation, honor, or integrity.

complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (quotation marks omitted).

## II. Background

During his time as Administrator of MAT, Chiaravallo oversaw MAT's vehicle fleet, financial obligations, and grant applications to various city, state, and federal agencies. Compl. ¶¶ 26–30. In 2016, MAT faced growing financial problems. *Id.* ¶¶ 32–34. On July 1, 2016, the State decreased MAT's funding by approximately $50,000. *Id.* ¶ 34. The next fiscal year, beginning on July 1, 2017, the State reduced MAT's funding by another $80,000. *Id.* ¶ 36. To address the decrease in funding, Chiaravallo sent an email to state Representative Joseph Serra on January 12, 2017, advising him that MAT did not have the funds necessary to operate its current service lines and that MAT would be forced to implement service reductions unless MAT received additional funding. *Id.* ¶ 39.

In March 2017, Chiaravallo sent emails and letters to the Connecticut Department of Transportation regarding MAT's financial distress. *Id.* ¶ 42. On March 8, 2017, Chiaravallo met with Mayor Drew during an annual meeting on the City's budget. *Id.* ¶ 43. At the meeting, Chiaravallo advised Mayor Drew that MAT would be making service cuts if it did not receive additional funding. *Id.* Chiaravallo also advised Mayor Drew that he would be seeking funding from the State and not the City, to which Mayor Drew responded, "good job." *Id.* On April 10,

3

2017, the City's Common Council held Budget Department Hearings with Mayor Drew and Chiaravallo present. *Id*. ¶ 45. At those meetings, Chiaravallo advised the City's Common Council and Mayor Drew that MAT had experienced funding cuts from the State and that raising fares had not made up those cuts. *Id*. ¶ 46. The Common Council, Mayor Drew, and the Board[2] were all allegedly aware of MAT's distressed financial condition by 2017. *See id*. ¶ 94.

On May 12, 2017, Chiaravallo advised Mayor Drew that MAT would be implementing bus and van service cuts and that MAT intended to announce those cuts to the public in three days. *Id*. ¶ 48. In response, Mayor Drew accused Chiaravallo of mismanaging MAT. *Id*. ¶ 51. Chiaravallo alleges that Mayor Drew subsequently made the following communications regarding Chiaravallo's mismanagement.

On June 9, 2017, Mayor Drew sent a letter to Chiaravallo which "falsely stated that [Mayor Drew] learned about MAT's service cuts after they had been made . . . when in fact [Mayor Drew] had been informed [earlier] on May 12, 2017 that bus and van service cuts would be made effective July 1, 2017, that Saturday evening bus and van service would be cut effective June 3, 2017, and that those cuts would be announced to the public on May 15, 2017." *Id*. ¶ 53. The letter also accused Chiaravallo of failing to inform local officials of the financial challenges facing MAT and accused Chiaravallo of potentially violating federal law by implementing the anticipated service cuts. *Id*. ¶¶ 54–57. The letter was copied to numerous state and local government officials and was also published over the internet, on television, and in newspapers including the Hartford Courant, the Middletown Press, WTNH, NBC Connecticut, and the Yankee Institute. *Id*. ¶ 52.

---

[2] The complaint alleges that each member of the Board was appointed by Mayor Drew to represent the City. *See* Compl. ¶ 94.

On June 23, 2017, Mayor Drew filed a formal complaint with the Federal Transit Administration ("FTA"), charging that Chiaravallo was responsible for violating federal law by implementing certain service cuts. *Id.* ¶ 58. Mayor Drew's complaint was publicly broadcasted in the Hartford Courant, the Middletown Press, and on the internet. *Id.*

On June 27, 2017, Mayor Drew sent a letter to Chiaravallo and the Board demanding that the Board terminate Chiaravallo's employment. *Id.* ¶ 59. The letter accused Chiaravallo of mismanagement alleging that Chiaravallo failed to inform government officials about MAT's financial situation. *Id.* The letter stated in part:

> Although MAT is a separate entity entirely from the City, and the City has no management authority over MAT, we do have a contract with MAT and we spend substantial taxpayer dollars on MAT. Your contract is currently on my desk for renewal, along with the substantial appropriation that accompanies it. I will not sign the contract or release the funds until the following requirements are met:
> 
> - Mr. Chiaravallo will resign immediately;
> - Mr. Lewis will terminate his consulting contract and any employment or contracting relationship with MAT immediately;
> - If these resignations do not occur, the Board will vote to terminate the respective employment and consulting relationships, effective immediately;
> - MAT will send a letter, duly authorized by the Board, to DOT and the City of Middletown, requesting help from DOT and asking that DOT provide an acting emergency manager, to be appointed by the Board, with full executive authority and full Board cooperation;
> - MAT's Board will transition from the six current members to two, which is the maximum number authorized by statute, and will work with the City on a transition plan to do so;
> - MAT will appoint a new representative to RiverCOG;
> - The H and I routes, as well as evening service, will remain in place.

Ex. A. to MAT Defs' Mot. to Dismiss (Doc. No. 21-2 at 2–3). The information in Mayor Drew's June 27, 2017 letter was publicly broadcasted in newspapers and over the internet. Compl. ¶ 63.

On June 28, 2017, Mayor Drew presented a synopsis of the recent events involving MAT at a meeting of the Lower Connecticut River Valley Council of Governments and Lower Connecticut River Valley Metropolitan Planning Organization. *Id.* ¶ 64. At that meeting, Mayor

5

Drew allegedly made false statements regarding MAT's facilities, stating that a new transportation facility was not budgeted properly. *Id.* ¶¶ 73–76. Mayor Drew also allegedly made false statements regarding Chiaravallo's handling of MAT's line of credit. *Id.* ¶¶ 77–78.

On June 29, 2017, in a letter to Mayer Drew signed by each of the directors of MAT, the Board wrote, "[i]n response to your letter dated June 27, 2017, please be advised that, at your direction, the Board of Commissioners of Middletown Area Transit has terminated the employment of [Chiaravallo]." *Id.* ¶ 80. Based on the Board's response, Chiaravallo alleges that Mayor Drew exercised control over MAT in directing the Board to terminate his employment. *Id.* ¶ 81.

On June 30, 2017, the Board voted at a Special Meeting to fire Chiaravallo, with each member voting in favor of termination. *Id.* ¶ 82. The minutes of the June 30th Special Meeting state that the purpose of the meeting was "to move along as soon as possible to put our financial house in order." *See* Ex. B. to MAT Defs' Mot. to Dismiss (Doc. No. 21-3 at 1). The minutes state further that:

> **WHEREAS**, in light of those issues, the Board has determined to terminate Mr. Andrew Chiaravallo as Administrator and Mr. Cornell Lewis as Financial Consultant

*Id.* at 2. Chiaravallo's employment as Administrator of MAT was formally terminated by Brigham Smith, the City's General Counsel, and Mayor Drew. Compl. ¶ 85.

### III. Discussion

#### A. Chiaravallo States a Plausible Stigma-Plus Claim Against Mayor Drew

Chiaravallo asserts a procedural due process claim against Mayor Drew. He alleges that Mayor Drew made several stigmatizing statements leading up to his termination including allegations of mismanagement, implementation of anticipated service cuts in a way that

potentially violated federal law, and failure to inform Mayor Drew of the financial challenges facing MAT. *See* Compl. ¶¶ 54, 55, 59, 86.

Chiaravallo's due process claim is a "stigma-plus" claim because "it involves an injury to one's reputation (the stigma) coupled with the deprivation of some tangible interest or property right (the plus), without adequate process." *Segal v. City of New York*, 459 F.3d 207, 212 (2d Cir. 2006) (internal quotations omitted). To state a stigma-plus claim based on termination from government employment, Chiaravallo must establish three elements:

> First, [he] must . . . show that the government made stigmatizing statements about [him]—statements that call into question [his] good name, reputation, honor, or integrity . . . . [S]tatements that denigrate [his] competence as a professional and impugn [his] professional reputation in such a fashion as to effectively put a significant roadblock in that [his] continued ability to practice [his] profession will satisfy the stigma requirement.
>
> Second, [he] must prove that these stigmatizing statements were made public.
>
> Third, [he] must show that the stigmatizing statements were made concurrently with, or in close temporal relationship to, [his] dismissal from government employment.

*Id.* at 212–13 (internal citations, quotations, and footnotes omitted).

The City Defendants argue that Chiaravallo fails to state a valid stigma-plus claim because he does not allege "sufficient stigma." Mem. in Supp. Mot. to Dismiss (Doc. No. 27-1) at 11. Under the stigma-plus standard articulated in *Segal*, the City Defendants contend that comments relating to professional competence alone are insufficient to establish a stigma-plus claim. *Id.* at 13–14. "There is no case that the Defendants could locate that holds that such statements, when made prior to a termination by a different agency, are sufficiently stigmatizing to meet the requirements of a stigma-plus theory. In fact, the case law is clear only as to liability caused by more severe statements." *Id.* at 14.

The City Defendants cite *O'Neill v. City of Auburn*, where the Second Circuit held that "governmental allegations of professional incompetence, made in connection with an employee's

7

termination, will not support a cause of action for a name-clearing hearing unless the allegations go 'to the very heart of [the employee's] professional competence,' . . . and threaten to 'damage his professional reputation' . . . significantly impeding his ability to practice his profession." 23 F.3d 685, 692–93 (2d Cir. 1994) (internal citations omitted). Mayor Drew also relies on *Quinn v. Syracuse Model Neighborhood Corp*., where the court held that a plaintiff alleged sufficient stigma by showing that the defendants "openly charged [the plaintiff] with illegal and immoral conduct." 613. F.2d 438, 445 (2d Cir. 1980). The *Quinn* court noted, however, that "stigmatizing information is not limited to charges of illegality, dishonesty or immorality." *Id*. at 446 n.4.

In response, Chiaravallo contends that Mayor Drew's statements accusing him of violating federal law and lying about his management of MAT are sufficient to state a valid stigma-plus claim. Opp. to Mot. to Dismiss (Doc. No. 38) at 12–13. He relies on *Levy v. Velez*, 401 F.3d 75, 90 (2d Cir. 2005), where the Second Circuit held that a plaintiff asserted a valid stigma-plus claim when comments made by a board of directors that called for the plaintiff's termination were later ratified by a Chancellor in response to the board's directive.

> Velez . . . asserts that not only did none of the defendants seek to separate the removal decision from the allegedly stigmatizing statements, but that the Chancellor's decision to exclude her from office was *expressly* based on her purportedly "criminal" and "inappropriate behavior." In other words, Velez alleges that the board members made, and sought to publicize in local news sources, highly stigmatizing statements that explicitly requested her removal by Chancellor Levy. She also asserts that Levy responded to the board members' charges by removing her from office on the basis of those charges. Thus, Velez's complaint claims that the board members imposed a "stigma" and asked for a "plus," and that the Chancellor, against the backdrop of, and based upon, the board members' statements, imposed the very same "plus" requested by the board members, thereby adopting the "stigma." Taking these allegations as true, we conclude that this combination of activities implicated Velez's "stigma-plus" liberty interest, and that Velez adequately asserts the deprivation of such an interest.

*Id.* (internal footnote omitted).

When accepting Chiaravallo's allegations as true, he states a valid stigma-plus claim against Mayor Drew. Although the City Defendants argue that Mayor Drew's comments only relate to Chiaravallo's job performance, the complaint alleges that Mayor Drew made a series of comments that could potentially denigrate his competence as a professional manager. For example, Mayor Drew's later dated June 9, 2017 accused Chiaravallo of implementing service cuts in a way that potentially violated federal law and of failing to inform him and other local officials about MAT's challenges. Compl. ¶¶ 54–55. Mayor Drew's complaint with the FTA on June 23, 2017 charged that "[Chiaravallo] was responsible for violating federal law in the implementation of certain service cuts." Compl. ¶ 58. On June 28, 2017, Mayor Drew allegedly stated that MAT under Chiaravallo's direction made "false projections" when preparing budgets and misused its line of credit. *Id*. ¶¶ 69, 77.

It is reasonable to conclude that statements inferring that Chiaravallo lied to local government officials or violated federal law go "to the very heart of [Chiaravallo's] professional competence . . . and threaten to damage his professional reputation . . . significantly impeding his ability to practice his profession." *O'Neill*, 23 F.3d at 692 (internal citations and quotations omitted). Because Chiaravallo alleges that Mayor Drew "openly charged [him] with illegal and immoral conduct," those statements are sufficiently stigmatizing to state a valid stigma-plus claim. *Quinn*, 613 F.2d at 445.

The second and third elements of a stigma-plus claim set forth in *Segal* are also satisfied. Chiaravallo notes that Mayor Drew's June 9, 2017 letter was broadcasted publicly in the Hartford Courant, the Middletown Press, and NBC Connecticut. *See* Compl. ¶ 52. Similarly, Mayor Drew's June 23, 2017 complaint with the FTA was broadcasted in the media and his June 23, 2017 remarks were made at a meeting of the Lower Connecticut River Valley

9

Council of Governments and Lower Connecticut River Valley Metropolitan Planning Organization. *Id*. ¶¶ 58, 64. Finally, Mayor Drew's purported statements were made in the weeks leading up to Chiaravallo's June 29, 2017 termination. Thus, Mayor Drew's alleged statements were made "concurrently with, or in close temporal relationship to, [Chiaravallo's] dismissal from government employment." *Segal*, 459 F.3d at 212–13 (2d Cir. 2006).

Therefore, Chiaravallo states a plausible stigma-plus claim against Mayor Drew.

B. Mayor Drew is Not Entitled to Qualified Immunity at This Stage

The City Defendants also argue that Mayor Drew is entitled to qualified immunity. A governmental official is entitled to qualified immunity either where (1) his conduct does not amount to a constitutional violation or (2) where the conduct does not violate a "clearly established" right protected by the Constitution. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A proper application of qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011) (internal quotations omitted). However, "[w]here the circumstances are in dispute and contrasting accounts . . . present factual issues as to the [alleged conduct of the defendant] and its reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." *Mickle v. Morin*, 297 F.3d 114, 122 (2d Cir. 2002) (internal quotations omitted).

At the motion to dismiss stage, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See al-Kidd*, 563 U.S. at 734. It is often the case that a court will be unable to rule on a qualified immunity defense until discovery has been completed or the factual issues have been resolved at trial. *See, e.g., Southerland v. City of New York*, 680 F.3d 127, 161 (2d Cir. 2012). Nevertheless, it is

proper—and desirable—to resolve the issue of qualified immunity at the motion to dismiss stage when it can be established by relying solely on the facts alleged in the complaint.

Courts typically frame the qualified immunity analysis by requiring the defendant to establish one of two conditions: that "[1] the defendant's action did not violate clearly established law, or [2] it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Russo v. City of Bridgeport,* 479 F.3d 196, 211 (2d Cir. 2007)).

1. Clearly Established Law

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015). The right must be evaluated in the context of Supreme Court and Second Circuit precedent "as it existed at the time of the challenged conduct." *McGowan v. United States*, 825 F.3d 118, 124 (2d Cir. 2016) (quoting *Garcia*, 779 F.3d at 92). Nonetheless, "the absence of a decision by [the Second Circuit] or the Supreme Court directly addressing the right at issue will not preclude a finding that the law was clearly established so long as preexisting law clearly foreshadows a particular ruling on the issue." *Id.* (internal quotations, alterations, and citations omitted). Although there need not be a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor*, 135 S. Ct. at 2044 (internal quotations and citations omitted).

The City Defendants contend that it was not clearly established that Mayor Drew's comments would deprive a government official of a liberty interest. "No case law from the Supreme Court or the Second Circuit clearly establishes that the type of statements allegedly made by [Mayor Drew] are sufficiently stigmatizing to deprive a plaintiff of a liberty interest in

11

good name and reputation." Mem. in Supp. Mot. to Dismiss at 19. The City Defendants cite *Young v. County of Fulton* for the proposition that that a district court decision does not clearly establish law. 160 F.3d 899, 903 (2d Cir. 1998). Instead, the right must be previously recognized by the Supreme Court or the Second Circuit. *See id.*

In response, Chiaravallo argues that Mayor Drew's actions violated a clearly established due process right. In support, Chiaravallo relies on Judge Arterton's ruling in *Holmes v. Town of East Lyme*.

> The case law describing the constitutional protections where liberty or property interests are at stake is longstanding and well established. "Where a person's good name, reputation, honor or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). In *Roth*, the Supreme Court held that the dismissal of a government employee accompanied by a "charge against him that might seriously damage his standing and associations in his community" would qualify as something "the government is doing to him," so as to trigger the due process right to a hearing. *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701. Thus, the Court concludes that at the time of Plaintiff's dismissal, his rights were clearly established.

866 F. Supp. 2d 108, 128 (D. Conn. 2012).

Judge Arterton's ruling is instructive. The Supreme Court's holding in *Constantineau* makes clear that when an individual's reputation or professional competence is damaged due to governmental action, notice and an opportunity to be heard must be afforded.[3] 400 U.S. 433, 437. The damage done to a person's reputation need not involve the stigma of a criminal conviction. *Id*. (citing *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 168, (1951) (Frankfurter, J., concurring) ("[T]he right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.")). In addition, the *Roth* Court opined that a

---

[3] *Constantineau* involved a due process challenge to a Wisconsin state statute, which required liquor stores to publicly post the names of individuals who were banned from such establishments due to their "excessive drinking." *Id.* at 433.

liberty interest would be created if a state university denied a professor tenue, based on a "charge against him that might seriously damage his standing and associations in his community . . . for example that he had been guilty of dishonesty, or immorality . . . . In such a case, due process would accord an opportunity to refute the charge before University officials." 408 U.S. 564, 573 (1972).

Based on the holdings by the Supreme Court in *Constantineau* and *Roth*, I conclude that when Chiaravallo was terminated as Administrator of the MAT, based on a governmental official's allegations that he was dishonest and potentially violated the law, Chiaravallo had a clearly established right to notice and an opportunity to be heard.

2. Objective Reasonableness

Even if a court determines that a right is clearly established, qualified immunity will protect a government official "if it was objectively reasonable for [the official] to believe that his acts did not violate those rights." *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000) (quoting *Russell v. Coughlin,* 910 F.2d 75, 78 (2d Cir. 1990)) (alterations omitted). The inquiry is "not whether the [official] *should have* acted as he did . . . [i]t is instead whether *any* reasonable [official], out of the wide range of reasonable people . . . *could have* determined that the challenged action was lawful." *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016).

The City Defendants argue that no reasonable person in Mayor Drew's position could be expected to provide Chiaravallo with due process. Mem. in Supp. Mot. to Dismiss at 20. In opposition, Chiaravallo contends that a "reasonable Mayor would have known that some kind of process was required prior to [Chiaravallo's] deprivation." Opp. to Mot. to Dismiss at 17.

Viewing the facts in a light most favorable to Chiaravallo, no reasonable official in Mayor Drew's position would have believed that he could make such stigmatizing statements in

connection with Chiaravallo's termination, without affording him adequate process. Though discovery will determine the extent to which any Mayor Drew's statements influenced Chiaravallo's termination, at the motion to dismiss stage Mayor Drew is not entitled to qualified immunity.

C. Chiaravallo States a Plausible Section 1983 Claim Against the City

Finally, the City Defendants move to dismiss Count Two, asserting that Chiaravallo fails to state a procedural due process claim against the City of Middletown, because Mayor Drew does not have final policymaking authority over MAT. Mem. in Supp. Mot. to Dismiss at 22.

Under Section 1983, a municipality cannot be held liable for the acts of an employee under the principle of *respondeat superior*. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (U.S. 1978). However, a "municipality may be liable for allegedly unconstitutional acts of a municipal employee if a plaintiff was subjected to the denial of his constitutional rights as a result of an official policy or custom." *Tagliaferi v. Town of Hamden*, 2014 WL 129223 at *11 (D. Conn. Jan. 14, 2014). "There must be a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation . . . This link must be established by more than mere allegations; a plaintiff must show that through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). There are three ways to show that the municipality was the "moving force" behind an injury: (1) through an unconstitutional municipal policy, (2) through unconstitutional municipal custom or practice, and (3) through the unconstitutional decision of a municipal

policymaker with final policymaking authority over the conduct at issue. *See Zherka v. DiFiore*, 412 F. App'x 345, 348 (2d Cir. 2011); *see also Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000).[4]

A single decision made by the final policy making authority, such as the governing body of a local government, or one having the power to decide finally on its behalf, can constitute a "policy" under Section 1983. *See Monell*, 436 U.S. at 694–95. "An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003).

Here, the City Defendants argue that Chiaravallo fails to state a claim against the City because Mayor Drew does not have final decision-making authority over MAT under the City's Charter. Mot. to Dismiss at 22–23.

> Pursuant to [the] City's Charter, it is the Middletown Common Council, "the legislative body of the City," which "shall have the power, authority and duty . . . to adopt a budget for each fiscal year . . . ." City of Middletown Charter, Ch. III, § 4. [Chiaravallo] has not alleged that [the] City's Common Council played any role in his termination, and therefore, [the] City cannot be liable to [Chiaravallo] for his liberty interest claims.

*Id.* Therefore, Chiaravallo's claim that Mayor Drew had decision-making authority over the MAT's decision to terminate him is beyond the powers afforded to the Mayor by the City's Charter.

In opposition, Chiaravallo cites Chapter IV of the City's Charter, which provides that, "[t]he Mayor shall be the chief executive officer of the City" and that "the Mayor shall be directly responsible for the administration of all Departments, Agencies and Offices, in charge of persons or Boards appointed by the Mayor and shall supervise and direct the same." Opp. to Mot. to Dismiss at 18 (citing City of Middletown Charter, Ch. IV, § 2).

---

[4] Whether an official has final policymaking authority is a legal question, determined on the basis of state law. *Barnes*, 208 F.3d at 57.

When viewing the allegations in the complaint in a light most favorable to Chiaravallo, it is plausible that Mayor Drew retained final decision-making authority over MAT and its Board. Specifically, in his June 27, 2017 letter Mayor Drew threatened to defund MAT (and circumvent any limitation on his power under the City's Charter), if the Board did not respect his demands and fire Chiaravallo immediately. *See* Compl. ¶ 59. The MAT Defendants responded to Mayor Drew's demands, stating "[i]n *response to your letter* dated June 27, 2017, please be advised that, *at your direction*, the Board of Commissioners of Middletown Area Transit has terminated the employment of [Chiaravallo]." *Id*. ¶ 80 (emphasis added). Although the City's Charter may limit Mayor Drew's authority over MAT,[5] Chiaravallo plausibly alleges that Mayor Drew's actions circumvented any limitation on his power over MAT and therefore constituted a "policy" under Section 1983. *See Monell*, 436 U.S. at 694–95.

Accordingly, Chiaravallo states a plausible Section 1983 claim against the City of Middletown.

## IV. Conclusion

For the reasons stated above, the City Defendants' motion to dismiss (doc. no. 27) is **denied.**

So ordered.

Dated at Bridgeport, Connecticut, this 10th day of September 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

---

[5] It is unclear from the provision cited by the City Defendants how the City Charter actually limits Mayor Drew's ability to appoint MAT's Board.

16