# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ANDREW CHIARAVALLO,
     Plaintiff,

     v.

MIDDLETOWN TRANSIT DISTRICT, et al.,
     Defendants.

No. 3:18-cv-1360 (SRU)

## RULING ON MOTION FOR SUMMARY JUDGMENT

Andrew Chiaravallo ("Chiaravallo"), former Administrator of the Middletown Transit District ("Middletown Area Transit" or "MAT"), filed this action in 2018 against the City of Middletown ("the City"), former City Mayor Daniel Drew ("Drew"), the MAT and certain members of the MAT Board of Directors ("the Board"), generally alleging that he was removed from his position without due process in violation of the Fourteenth Amendment and additionally raising numerous state-law claims. Following dismissal of the MAT defendants from the action, Drew and the City moved for summary judgment on all remaining claims.

For the following reasons, the motion for summary judgment is **granted** in part and **denied** in part.

## I.   Background

### A.   Local Rule 56(a)(2) Statement of Facts

District of Connecticut Local Rule 56(a)(1) requires that a party moving for summary judgment:

> file and serve with the motion and supporting memorandum a document entitled "Local Rule 56(a)1 Statement of Undisputed Material Facts," which sets forth, in separately numbered paragraphs meeting the requirements of Local Rule 56(a)3, a concise statement of each material fact as to which the moving party contends there is no genuine issue to

be tried.

D. Conn. L. Civ. R. 56(a)(1). A party opposing a motion for summary judgment must respond by

filing:

> a document entitled Local Rule 56(a)2 Statement of Facts in Opposition to Summary
> Judgment, which shall include a reproduction of each numbered paragraph in the moving
> party's Local Rule 56(a)1 Statement followed by a response to each paragraph admitting
> or denying the fact and/or objecting to the fact…

D. Conn. L. Civ. R. 56(a)(2). Each statement of fact or denial in the Rule 56(a)(1) and (2)

statement must cite to "(1) the affidavit of a witness competent to testify as to the facts at trial, or

(2) other evidence that would be admissible at trial." D. Conn. L. Civ. R. 56(a)(3). Material facts

included in the 56(a)(1) statement that are "supported by the evidence will be deemed admitted

(solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2

Statement." D. Conn. L. Civ. R. 56(a)(1).

This court has previously deemed facts admitted for purposes of summary judgment

where a "plaintiff has objected to Defendant's facts but has failed to support [the] objection with

any admissible evidence in the record, where the record itself does not support Plaintiff's denials,

or where the Plaintiff has neither admitted nor denied a fact and where the record supports such

fact." *Johnson v. Connecticut Dept. of Administrative Services*, 972 F. Supp. 2d 223, 229 (D.

Conn. 2013); *see also Barone v. Judicial Branch of Connecticut,* 2019 U.S. Dist. LEXIS 221479,

at *35 (D. Conn. Dec. 27, 2019) (facts deemed admitted where Rule 56(a)(2) Statement failed to

point to "concrete evidence in the record" ); *Buell v. Hughes*, 568 F. Supp. 2d 235, 237 (D.

Conn. 2008) (facts deemed admitted where Rule 56(a)(2) Statement merely indicated that

plaintiffs lacked sufficient information to admit or deny a fact); *Giglio v. Derman*, 560 F. Supp.

2d 163, 166 (D. Conn. 2008) (facts deemed admitted where "Local Rule 56(a)(2) Statement

consist[ed] of refusals to respond, or responses that neither deny nor admit the fact asserted").

In the case at bar, the defendants vehemently object to nearly all the denials included in Chiaravallo's Rule 56(a)(2) Statement of Facts. Defs.' Rep. Doc. No. 103 at 2. Specifically, the defendants maintain that Chiaravallo's denials are improper because he: "1) denies facts other than the corresponding fact stated in Defendants' 56(a)(1) Statement; and/or 2) denies facts on the sole basis of their phrasing, form, or other non-substantive grounds; and/or 3) denies facts where the denial is unsupported by admissible evidence." *Id*. Because those denials do not comport with the requirements of Rule 56(a)(2), the defendants argue, each of the corresponding facts in the Rule 56(a)(1) statement should be deemed admitted.

After carefully reviewing the Rule 56(a)(2) statement, I disagree that any of the statements of fact included in the Rule 56(a)(1) statement should be deemed admitted on the basis of purportedly improper denials. As an initial matter, many of the defendants' statements of fact are actually legal propositions or conclusions not properly included in a Local Rule 56(a)(1) Statement. For example, paragraph 34, describing a letter sent by Drew to Chiaravallo, provides, "Mayor Drew did not make any statements about Plaintiff's reputation, good name, or character." L. R. 56(a)(1) Stmt. at ¶ 34. That Drew's statements did not impugn Chiaravallo's reputation, however, is an argument about how record evidence should be characterized rather than a statement of fact. To the extent that the defendants have set forth legal conclusions and arguments in the Rule 56(a)(1) statement, those statements will not be deemed admitted whether or not Chiaravallo's denials comport with the requirements of Rule 56(a)(2). *See, e.g., Giglio*, 560 F. Supp. 2d at 167 ("It is inappropriate for a party to make…legal arguments in a Local Rule 56 (a) Statement."); *Brown v. Tuttle*, 2015 U.S. Dist. LEXIS 81597, at *4 (D. Conn. June 24, 2015) (same).

Further, some of the statements in the Local Rule 56(a)(1) statement are not supported by evidence in the record. For example, paragraphs 42-46 do not, in my view, accurately reflect Chiaravallo's deposition testimony.[1] *See* Defs.' Ex. A, Doc. No. 86-2. Accordingly, those statements will not be deemed admitted. *See Johnson*, 972 F. Supp. 2d at 229 (improper denial led to admission of stated facts "where the record *supports* such fact") (emphasis added); *Gibson v. Wood*, 563 F. Supp. 2d 341, 343 n.2 (D. Conn. 2008) (deeming admitted facts "supported by evidence, and the denial of which is not supported by citations to evidence in the record in [the] Rule 56(a)(2) Statement").

Finally, despite the defendants' objections, the majority of Chiaravallo's denials *do* properly deny the stated fact and provide a "specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial" in support of that denial. D. Conn. L. Civ. R. 56 (a)(3).  For example, paragraph 18 of the Rule 56(a)(1) statement provides: "Plaintiff cannot identify where in Mayor Drew's letter that the Mayor falsely accused *him* of implementing service cuts in a way that potentially violates Federal Law." L. R. 56(a)(1) Stmt. at ¶ 18. Chiaravallo's denial cites directly to the letter in question, which is addressed to Chiaravallo and reads: "a multitude of constituents brought to my attention that you had eliminated bus routes in Middletown." Defs.' Ex. E, Doc. No. 86-6. It goes on to suggest that the disruption of those routes without hearing and notice could lead to potential violations of federal law. *Id.* Similarly, Paragraph 23 provides: "[a]lthough Plaintiff alleges that 'Defendant Drew's statement was that what MAT administrators told us has been

---

[1] Although the defendants additionally object to some of Chiaravallo's denials on the grounds that those denials rely on a single affidavit that contradicts his deposition testimony, I disagree with the defendants that the affidavit and testimony present such a conflict. *Compare* Pl.'s Ex. R, Doc. No. 98-19 *with* Defs.' Ex. A, Doc. No. 86-2. Further, Chiaravallo has additionally pointed to evidence other than his own affidavit in support of some of his denials. *See id.* at ¶ 26 (citing to ¶¶ 13-15).

pretty inconsistent so far'…this is plaintiff's speculation." L. R. 56(a)(1) Stmt. at ¶ 23. In response, Chiaravallo denies that the allegation is "speculation" and cites to the minutes of the meeting where that statement was made. *See id.; see also* Pl.'s Ex. N, Doc. No. 98-15.

In sum, I disagree with the defendants that any of the statements of fact included in the Rule 56(a)(1) statement should be deemed admitted on the basis of Chiaravallo's purportedly improper denials. In reviewing the defendants' motion for summary judgment and determining whether genuine disputes of material fact exist, I will rely on the parties' 56(a) statements to the extent that those statements properly identify factual disputes and are supported by record evidence. I have also conducted a careful review of the evidence submitted by both parties. *See Chalco v. Belair,* 738 F. App'x 705, 709 (2d Cir. 2018) (a district court has discretion to "undertake an independent review of the summary judgment materials" to determine whether genuine disputes of material fact exist). To the extent that either party has set forth legal arguments in the 56(a) statements, I will consider those arguments as part of my analysis.

B.   Factual Background

The MAT was created pursuant to the provisions of Connecticut General Statutes section 7-273b, which authorizes a town, city, borough or the legislative body of a municipality to form a transit district to provide "modern, efficient and adequate systems of mass transportation." Conn. Gen. Stat. § 7-273b. A transit district is defined by statute as a "body corporate and politic, and may sue and be sued…[and] borrow on the faith and credit of the district for its purposes under this chapter." *Id*. MAT receives funding from the State of Connecticut, the Federal Transit Administration and the City to finance the provision of various transportation services to residents of Middletown and surrounding communities. L. R. 56(a)(1) Stmt. at ¶ 9.

Connecticut General Statutes section 7-273c addresses procedures for the management of a transit district and provides that the "affairs…shall be managed by a board of directors chosen from among the electors of the constituent municipalities" who "shall be appointed by the elected chief executive of a city or borough." Conn. Gen. Stat. § 7-273c. In April 2012, Chiaravallo was appointed Administrator of the MAT by vote of the six-member Board. Defs.' Ex. A, Doc. No. 86-2 at 22: 10-18. As Administrator, Chiaravallo reported directly to the Board and was responsible for overseeing and managing MAT's operations. L. R. 56(a)(1) Stmt. at ¶ 8. Chiaravallo provides that, during his tenure as Administrator, approximately ninety percent of MAT's funding came from the State of Connecticut Department of Transportation ("DOT") and between ten and fifteen percent came directly from the City. Compl., Doc. No. 1 at ¶¶ 22, 24.

Chiaravallo maintains that he was a competent and effective administrator. In particular, he implemented various structural improvements to MAT's transportation services and financed those upgrades through state and federal grants so that the projects would not negatively impact MAT's operational funding. L. R. 56(a)(2) Stmt. at ¶ 68. Chiaravallo recalls that, in fiscal year 2016, MAT was in a good financial position and that as of "September 2016, MAT's line of credit balance was zero." Pl.'s Ex. R, Doc. No. 98-19 at ¶ 30.

In 2016, however, things began to change. L. R. 56(a)(2) Stmt. at ¶ 66. According to Chiaravallo, in fiscal year 2016, the State of Connecticut failed to provide its customary 2-3% increase in subsidies to account for inflation, effectively cutting MAT's overall budget and causing significant financial strain. Compl., Doc. No. 1 at ¶¶ 31-36. The state further reduced funding to MAT for fiscal year 2017. *Id.* at ¶ 36.

On November 10, 2016 Chiaravallo sent a letter to various individuals and agencies associated with MAT—including Drew—informing them that MAT planned to increase fares beginning in December 2016. Pl.'s Ex. A, Doc. No. 98-2. The letter attributed the fare increase to "a State-level (ConnDOT) 2-4% funding cut in operational subsidies effecting [sic] public transit statewide." *Id.* The letter further provided that the fare increases were implemented in lieu of service cuts but warned "if the fare increase does not offset the decreased funding, service cuts may still be required." *Id.*

On March 8, 2017, Chiaravallo and Drew both attended an annual meeting regarding the City's budget for the following year. Pl.'s Ex. R, Doc. No. 98-19 at ¶ 12. Chiaravallo maintains that, during the meeting, he advised Drew of MAT's "financial shortfall due to either budget cuts from the State of Connecticut, or appropriations from the State of Connecticut." *Id.* He recalls warning Drew that unless additional funding was procured from the State, service cuts would be necessary. *Id.* Chiaravallo further recalls explaining that it was the first time in MAT history that service cuts had been contemplated. *Id.*

About a month later, on April 10, 2017, the City of Middletown's Common Council held Department Budget Hearings. L. R. 56(a)(2) Stmt. at ¶ 52. Chiaravallo provides that he attended those hearings, and spoke about MAT's financial situation, advising that the attempt to compensate for state funding cuts by raising fares had not been successful. *Id.* at ¶ 53; *see also* Pl.'s Ex. R, Doc. No. 98-19 at ¶ 16. He further warned that any further decrease in state funding would lead to service cuts. *Id.* The defendants maintain that there is "no evidence" that Drew was in the meeting when Chiaravallo made that presentation. Defs.' Mem. Doc. No. 86-1 at 4 n.2.

On May 12, 2017, when MAT's financial situation had not improved, Chiaravallo sent an email to Drew notifying him that MAT planned to implement "bus and van service cuts." Pl.'s

Ex. D, Doc. No. 98-5. Specifically, Chiaravallo explained that MAT would be eliminating "Saturday evening bus and van service starting June 3rd." *Id.* Chiaravallo warned that the Mayor's office would likely "be getting calls from unhappy passengers on this issue. Reduced State funding is the answer." *Id.* Attached to the email was a copy of a letter Chiaravallo sent to the DOT, identifying additional service cuts that would take effect on July 1, 2017. *Id.* That letter provided:

> Our proposal is to eliminate nighttime fixed and paratransit service Monday through Saturday. We are currently closed on Sundays. Routes H & I fixed routes apply. We will also be reducing the Mlink (M route) service by about 40% Monday through Friday.

*Id.*

Chiaravallo also recalls attending meetings with Drew on May 31 and June 6. Pl.'s Ex. R, Doc. No. 98-19 at ¶ 23. Chiaravallo maintains that, during those meetings, he "made Defendant Drew fully aware of the severity of MAT's situation." Pl.'s Ex. R, Doc. No. 98-19 at ¶ 23. Chiaravallo additionally indicates that he shared information regarding the budget crisis with various state legislators and the Connecticut DOT throughout early 2017. *Id.* at ¶¶ 10-11; *see also* Pl.'s Ex. B, Doc. No. 98-3; Ex. E, Doc. No. 98-6.

Finally, Chiaravallo provides that he contacted the Federal Transit Administration ("FTA") to seek federal assistance regarding MAT's financial crisis. Pl.'s Ex. R, Doc. No. 98-19 at ¶ 14. When it became clear that service cuts would be necessary, Chiaravallo recalls that he followed up with the FTA to ensure that those cuts were made in compliance with federal law. L. R. 56(a)(2) Stmt. at ¶ 56; *see also id.* at ¶ 20.

The defendants dispute that Chiaravallo "inform[ed] the City of MAT's dire financial crisis, or MAT's intention to suspend certain service" prior to implementing service cuts. Defs.' Ex. C, Doc. No. 86-4 at ¶¶ 7, 17-18. Instead, Drew and the City became aware of MAT's budget

crisis in "May or June of 2017" because constituents began to reach out to the Mayor's office to complain about "closures to routes H and I, and the discontinuation of the evening service." *Id.* at ¶¶ 6; *see also* L. R. 56(a)(1) Stmt. at ¶ 13. After the public outcry, Drew and the Middletown legislative delegation began investigating the decision to cut service and discovered that MAT's financial problems were "serious and required a serious solution." *Id.* at ¶ 13; Defs.' Ex. E, Doc. No. 86-6.

According to the defendants, that investigation revealed that MAT's financial crisis stemmed not from state funding cuts but instead from financial mismanagement; moreover, MAT had failed to "recognize, respond to, and report the deteriorating financial condition…on a timely basis." Defs.' Ex. H, Doc. No. 86-9. Further, MAT's finances were so "garbled that MAT was literally years behind on its audits. Its audits had not been submitted." Defs.' Ex. B, Doc. No. 86-3 at 57:21-23. Moreover, MAT had used "state grant funding pools" improperly and was in such financial disarray that it was "on the verge of insolvency." *Id.* at 58:6-8, 4. Finally, the cancellation of various service routes had not occurred in "compliance with federal regulations." *Id.* at 57:19-20.

On June 9, Drew sent Chiaravallo a letter addressing the service cuts. The letter provided, in relevant part:

Mr. Chiaravallo,

Recently, a multitude of constituents brought to my attention that you had eliminated bus routes in Middletown. The Middletown legislative delegation was also made aware of these complaints. Shortly afterwards, I met with you and our legislative delegation to determine why bus routes had been reduced or changed in any way. To my surprise and dismay, we have discovered more serious concerns facing Middletown Area Transit than the elimination of bus routes. We have discovered serious financial and management challenges threatening the existence of MAT itself.

As you are aware, MAT is a statutorily authorized transit district and is a separate corporate body from the City of Middletown and the State of Connecticut. Nonetheless, while MAT

> is not a city agency, public transportation is of the utmost concern to the city as is your use
> of the subsidies we provide to MAT…I understand that discontinuing routes without
> adequate hearing and notice can result in potential violations of federal law.
> …
> Expediency and transparency are vitally important in this matter. It is unfortunate that
> MAT did not see fit to inform us regarding any operational challenges facing the
> organization before the problems rose to levels now affecting our community. As such, it
> is clear that intervention on behalf of the community is not only appropriate, but necessary.

Defs.' Ex. E, Doc. No 86-6. The letter was copied to other individuals involved in state, local

and regional government. *Id.; see also* Pl.'s Ex. R, Doc. No. 98-19 at ¶ 25. Chiaravallo maintains

that information about the letter was "made public, including over the internet, on television, and

in newspapers." *Id.*

On June 21, Drew issued a press release stating that the City had recently become aware

of serious of financial issues affecting MAT. Pl.'s Ex. K, Doc. No. 98-12. The release further

provided:

> As soon as the City became aware of these issues, as Mayor, I took part in a series of
> meetings with MAT's management…Although the City and State do not have any authority
> to direct or manage MAT, we are working together to find a solution to what is clearly a
> very serious problem. While they may be MAT's customers, they are Middletown's
> citizens, and as their Mayor, I will do everything I can to protect them.

*Id.* On June 22, Drew filed a formal complaint with the FTA alleging that MAT had violated

various provisions of Title VI in implementing the June service cuts. Pl.'s Ex. L, Doc. No. 98-13.

The following day, Drew posted an update on his public Facebook page reporting that he had

filed an FTA complaint outlining the City's "belief that MAT has not followed proper procedure

in noticing, hearing, and ultimately cancelling routes." Pl.'s Ex. M, Doc. No. 98-14.

Drew also spoke to the media and attended public meetings in the aftermath of the outcry

over the service cuts; at those public meetings, he generally attributed the cuts to financial

mismanagement at MAT. Pl.'s Ex. J, Doc. No. 98-11 at 113-114. It is not clear, however,

precisely what Drew said during those meetings, or whether he referred to Chiaravallo by name.

*Id.* at 114:12-13.

On June 27, Drew sent a second letter to Chiaravallo and the MAT Board. Defs.' Ex. F,

Doc. No. 86-7. That letter provided, in relevant part:

> Mr. Chiaravallo and Board Members,
>
> As you know, the City and State recently became aware of a whole host of financial and management concerns with MAT. The concerns were brought to light after constituents complained about potential closures to routes H and I and the end of evening service.
> …
> Although MAT is a separate entity entirely from the City, and the City has no management authority over MAT, we do have a contract with MAT and we spend substantial taxpayer dollars on MAT. Your contract is currently on my desk for renewal, along with the substantial appropriation that accompanies it. I will not sign the contract or release the funds until the following requirements are met:
> · Mr. Chiaravallo will resign immediately;
> · Mr. Lewis will terminate his consulting contract and any employment or contracting relationship with MAT immediately;
> · If these resignations do not occur, the Board will vote to terminate the respective employment and consulting relationships, effective immediately;
> · MAT will send a letter, duly authorized by the Board, to DOT and the City of Middletown, requesting help from DOT and asking that DOT provide an acting emergency manager, to be appointed by the Board, with full executive authority and full Board cooperation;
> · MAT's Board will transition from the six current members to two, which is the maximum number authorized by statute, and will work with the City on a transition plan to do so;
> · MAT will appoint a new representative to RiverCOG;
> · The H and I routes, as well as evening service, will remain in place
> …
> I do not make these demands lightly, but I do not take lightly, either, the magnitude of MAT's issues and their impact on my constituents.
> …
> I expect that you will work with the City and the State and that you will meet the above requirements. Again, if you do not, I will not renew your contract or release your funds, and I hold open the option of the City's withdrawal from MAT as well.

*Id.* That letter was copied to other legislators involved in state and local government; portions of

the letter were additionally published online and in the media. *Id.; see also* Compl., Doc. No. 1 at

¶ 63; Answer, Doc. No. 61 at ¶ 63.

11

On June 28, Drew attended a meeting of the Lower Connecticut River Valley Council of

Governments and Lower Connecticut River Valley Metropolitan Planning Meeting ("COG

Meeting"). L. R. 56(a)(1) Stmt. at ¶ 25. At that meeting, Drew spoke at length about MAT's

financial issues and the unpopular service cuts. *Id.* In particular, he attributed those service cuts

to MAT's "extraordinarily precarious" financial position and alleged that MAT had: improperly

maxed out their credit line to make up for budget deficits; relied on false projections in

formulating the annual budget; and failed to account for operating costs associated with a new

depot despite prior warnings from the state about those costs. Pl.'s Ex. N, Doc. No. 98-15. He

described the explanations given by MAT administrators for the financial crisis as "pretty

inconsistent" and suggested that any attempt to blame state funding cuts for the problems was

wrong. *Id.* He further advised that he had filed an FTA complaint alleging that MAT had failed

to follow proper procedures prior to implementing the service cuts. *Id.*

Finally, he told those present at the meeting that, on June 27, he had asked that the MAT

Administrator and Chief Financial Officer resign; if they refused to do so, he had asked that the

Board remove them. *Id.* Although Drew does not appear to have referred to Chiaravallo by name,

Chiaravallo maintains that "based on the minutes of who was in attendance at the June 28, 2017

meeting…those government officials knew who Plaintiff was and knew that Plaintiff was the

Administrator of the MAT about whom Drew was speaking." L. R. 56(a)(2) Stmt. at ¶ 79.

On June 29, Chiaravallo met with the MAT Board to discuss the demands outlined in

Drew's June 27 letter. L. R. 56(a)(2) Stmt. at ¶ 81. The defendants maintain that the meeting

functioned as a pre-termination hearing; relying on Chiaravallo's deposition testimony, they

contend that he was provided ample notice of his termination in the June 27 letter and then

afforded the opportunity to defend himself against Drew's allegations on June 29, prior to his

formal termination. L. R. 56(a)(1) Stmt. at ¶ 45; Defs.' Mem. Doc. No. 86-1 at 22. Specifically, the defendants cite to Chiaravallo's testimony that, at the meeting, he had an opportunity to "express how I felt" and "to speak…you know, I said what I had to say." Defs.' Ex. A, Doc. No. 86-2 at 164: 1-2, 16-18.

Chiaravallo disputes that any hearing took place. L. R. 56(a)(2) Stmt. at ¶ 42. According to Chiaravallo, at the meeting on June 29, "there was no discussion about any of my actions that I had taken as MAT Administrator, such as my actions to cut service, or relating to any of the financial or management issues claimed by Drew." *Id*. at ¶ 82. The discussion instead "focused on what options were available and Plaintiff had an opportunity to speak with the Board on that subject." *Id.* at ¶ 83.

That same day, June 29, the Board sent Drew a letter that read: "[i]n response to your letter dated June 27, 2017, please be advised that, at your direction, the Board of Commissioners of Middletown Area Transit has terminated the employment of Mr. Chiaravallo." Defs.' Ex. G, Doc. No. 86-8.

On June 30, the MAT Board convened a Special Meeting in part to discuss the "Employment, Performance, and Dismissal of Administrator and Financial Consultant." L. R. 56(a)(1) Stmt. at ¶ 39; Middletown Transit District Board of Directors Special Meeting Agenda.[2] During the meeting, the Board Members passed a formal resolution terminating Chiaravallo's employment as Administrator. *Id*. That resolution was "drafted by the City's General Counsel, Brigham Smith, acting in his official capacity as General Counsel for the City, as directed by Mayor Drew." L. R. 56(a)(1) Stmt. at ¶ 40. Drew's statements were subsequently adopted and ratified by the City and MAT. *Id*. at ¶ 41.

---

[2] The agenda and minutes from that meeting were submitted directly to the Court following oral argument and were not filed as an exhibit.

Less than two weeks later, on July 12, Drew announced his intention to run for Governor of the State of Connecticut. See Pl.'s Ex. Q, Doc. No. 98-18.

## II.      Procedural History

Chiaravallo filed this action on August 13, 2018, bringing twelve claims against the City, Drew, the MAT and certain MAT Board members in their individual and official capacities. *See* Compl., Doc. No. 1. On September 12, 2018, the MAT defendants moved to dismiss the claims raised against them; Drew and the City moved separately to dismiss the complaint on October 10, 2018. *See* Mot. to Dismiss, Doc. Nos. 21, 27. Following a hearing on February 25, 2019, I dismissed the claims against the MAT defendants without prejudice. *See* Min. Entry, Doc. No 49.  Chiaravallo did not move to amend the complaint to replead claims against the MAT defendants, and those defendants were ultimately dismissed from the action. On September 10, 2019, I denied the Drew and the City defendants' motion to dismiss in a written order. *See* Order, Doc. No. 58. Following discovery, Drew and the City defendants moved for summary judgment on all remaining counts of the complaint.

## III.     Standard of Review

Summary judgment is appropriate when the record demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (a court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

A court reviewing a motion for summary judgment must construe the facts of record in the light most favorable to the nonmoving party and "resolve all ambiguities and draw all

inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("on summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion") (quoting *United States* v. *Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not "rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible" but must instead present sufficient probative evidence to establish a genuine issue of material fact. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995); *see also Matsushita*, 475 U.S. at 586 ("When the moving party has carried its burden…its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Where conflicting evidence exists with regard to an issue of material fact, summary judgment is improper.

## IV.   <u>Discussion</u>

Chiaravallo generally alleges that the circumstances surrounding his termination give rise to a number of state and federal claims against Drew and the City. Specifically, Chiaravallo

brings claims under section 1983 against both Drew in his individual and official capacities and against the City, claiming that he was denied due process in conjunction with his termination in violation of the Fourteenth Amendment. He additionally requests that I exercise supplemental jurisdiction over state-law claims for defamation, intentional interference with a business relationship and false light invasion of privacy raised against Drew in his individual capacity.

As an initial matter, because "[a]n official capacity suit against a public servant is treated as one against the governmental entity itself," the section 1983 claim against Drew in his official capacity is duplicative of his section 1983 claim against the city. *Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007) (cleaned up); *see also Demski v. Town of Enfield,* 2015 U.S. Dist. LEXIS 95116, at *6 (D. Conn. July 22, 2015) ("district courts within the Second Circuit consistently dismiss as duplicative claims asserted against officials in their official capacities where the plaintiff has named the municipal entity as a defendant") (collecting cases). Accordingly, to the extent that Chiaravallo intends to bring a section 1983 claim against Drew in his official capacity, that claim is dismissed. *See, e.g., Jean v. Cnty. of Nassau,* 2020 U.S. Dist. LEXIS 45279, at *17 n.6 (E.D.N.Y. Mar. 16, 2020) (dismissing official capacity claim on summary judgment where the municipal entity was named in the complaint).

A.    Section 1983 Claim

Section 1983 provides a private remedy for violations of federal or constitutional rights committed by officials acting "under the color of state law." 42 U.S.C. § 1983. To state a cognizable section 1983 claim premised on a due process violation, a plaintiff must show that "as the result of conduct performed under color of state law, [he or she] was deprived of life, liberty, or property without due process of law." *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996). Where, as here, there is no dispute that a defendant acted under color of state law, the focus of

the inquiry is "(1) whether the plaintiff had a protected liberty interest…and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Id.* at 351-52.

1.   <u>Liberty Interest</u>

The scope of liberty interests protected under the due process clause of the Fourteenth Amendment extends far beyond physical "freedom from bodily restraint." *Board of Regents v. Roth*, 408 U.S. 564, 572 (1972). "Liberty, as enshrined in the Fourteenth Amendment, is a broad notion, and one of the many freedoms it encompasses is the freedom to engage in any of the common occupations of life." *Donato v. Plainview-Old Bethpage Central School District,* 96 F.3d 623, 630 (2d Cir. 1996) (cleaned up). Accordingly, liberty interests may be implicated when the government imposes "a stigma or badge of disgrace," *Wisconsin v. Constantineau*, 400 U.S. 433, 436 (1971), that imperils an individual's freedom "to take advantage of…employment opportunities." *Roth*, 408 U.S. at 573. In order to rise to the level of constitutional injury, however, the government-imposed stigma must be "coupled with the deprivation of a more tangible interest," such as loss of government employment. *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004); *see also Donato.,* 96 F.3d at 630 ("A free-standing defamatory statement made by a state official about an employee is not a constitutional deprivation…[but] a defamatory statement about an employee implicates a liberty interest when it is made during the course of that employee's termination from employment.").

A claim that a government actor has made defamatory statements in conjunction with termination from government employment is therefore "referred to as a stigma-plus claim; it involves an injury to one's reputation (the stigma) coupled with the deprivation of some tangible interest or property right (the plus)." *Segal v. City of N.Y.*, 459 F.3d 207, 212 (2d Cir. 2006). To state a cognizable stigma-plus claim premised on termination from government employment, a

17

plaintiff must show: (1) "the government made stigmatizing statements about [him or her] - statements that call into question the plaintiff's good name, reputation, honor, or integrity"; (2) "these statements were made public"; and (3) "the stigmatizing statements were made concurrently with, or in close temporal relationship to, the plaintiff's dismissal from government employment." *Id.* (cleaned up).

Not every offensive statement made by a government actor gives rise to a constitutional claim; rather, the statements must "denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession." *Donato*, 96 F.3d at 630-31. Moreover, "statements of opinion, even stigmatizing ones" cannot support a due process claim so long as they "do not imply false facts." *Holmes v. Town of East Lyme*, 866 F. Supp. 2d 108, 126 (D. Conn. 2012) (quoting *Strasburger v. Bd. of Educ.*, 143 F.3d 351, 356 (7th Cir. 1998)). Although statements must also be false in order to meet the standard, a plaintiff need only "raise the falsity of these stigmatizing statements as an issue" to survive summary judgment. *Patterson*, 370 F.3d at 330; *see also Brandt v. Board of Cooperative Educational Services, Third Supervisory District*, 820 F.2d 41, 43 (2d Cir. 1987).

The statements must also be made "sufficiently public to create or threaten a stigma; hence, a statement made only to the plaintiff, and only in private, ordinarily does not implicate a liberty interest." *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005); *see also Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (stigma-plus claim may arise "where the reasons for termination or resignation were given a public airing which impaired the prospects of the employee for other employment").

Although the prototypical stigma-plus claim involves a stigmatizing statement that "originates from the same state actor who imposes the plus" the Second Circuit has recognized that "perfect parity in the origin of both the 's[t]igma' and the 'plus' is not required to state the infringement of a stigma-plus liberty interest." *Velez*, 401 F.3d at 89. "There is no rigid requirement that both the 'stigma' and the 'plus' must issue from the same government actor or at the same time." *Id.* Instead, a plaintiff need only demonstrate sufficient proximity between "stigma" and "plus." *Id.* That requirement is satisfied if "(1) the stigma and plus would, to a reasonable observer, appear connected…and (2) the actor imposing the plus adopted (explicitly or implicitly) those statements in doing so." *Id.*

In the case at bar, Chiaravallo maintains that Drew made statements that impugned his competence as a professional manager by fostering the narrative that he had engaged in financial mismanagement, committed possible violations of federal law and concealed MAT's burgeoning financial crisis from the City. Chiaravallo points specifically to Drew's statements in the letters of June 9 and June 27; statements made at public meetings and to the media after the June 9 letter; his FTA complaint and subsequent Facebook post about that complaint; the press release issued by his office; and his comments at the COG meeting. Further, Chiaravallo contends, all of Drew's statements were made public. Portions of the letters sent to Drew were reprinted by various media outlets, and the COG meeting was open to the public. Chiaravallo claims that those statements are also demonstrably false. According to Chiaravallo, the service cuts were implemented in accordance with federal law; he additionally kept the City and Drew fully informed of MAT's financial struggles; and he committed no financial mismanagement during his tenure as administrator.

Moreover, Chiaravallo argues, those stigmatizing statements were proximately connected to his removal from the role of Administrator. Although he concedes that the MAT Board officially terminated him from his position, he maintains that Drew orchestrated his removal by threatening to withhold MAT's funds should the Board refuse to immediately terminate him. In particular, Chiaravallo points to Drew's letter of June 27 demanding Chiaravallo's removal as a condition of releasing MAT's funds, and the Board's letter in reply, which reads: "*at your direction*, the Board of Commissioners of Middletown Area Transit has terminated the employment of Mr. Chiaravallo." Defs.' Ex. F, Doc. No. 86-7; Ex. G, Doc. No. 86-8 (emphasis added).

Moving for summary judgment on that claim, the defendants train much of their fire on Chiaravallo's claim that Drew's statements were stigmatizing. In particular, the defendants argue that none of Drew's statements accused Chiaravallo of dishonest, illegal, or immoral conduct and therefore were not defamatory; moreover, his statements were true. In making those arguments, the defendants rely heavily on Chiaravallo's deposition testimony, pointing out that Chiaravallo conceded that he never informed Drew of the specific cuts MAT planned to implement and was unable to recall whether Drew accused him *personally* of potentially violating federal law. Defs.' Ex. A, Doc. No. 86-2 at 127: 21-25. Further, according to the defendants, Chiaravallo has failed to set forth any evidence that he was foreclosed from future employment because of Drew's statements.

As an initial matter, the defendants are certainly correct that "[n]ot every derogatory statement made about an employee who loses his or her job imposes sufficient stigma to implicate the liberty interest." *O'Neill v. City of Auburn*, 23 F.3d 685, 691 (2d Cir. 1994). Rather, the statements must "seriously impair [the plaintiff's] ability to take advantage of other

employment opportunities." *Huntley*, 543 F.2d at 985. In my view, however, many of Drew's statements meet that standard—they attack Chiaravallo's integrity and competence as a professional administrator and are "considerably graver than a charge of failure to perform a particular job." *Russell v. Hodges*, 470 F.2d 212, 217 (2d Cir. 1972). In particular, Drew's letter of June 9, 2017, copied to numerous officials in local and state government, is addressed to Chiaravallo; it reads, in relevant part, "[r]ecently, a multitude of constituents brought to my attention that you had eliminated bus routes" and goes on to suggest that "discontinuing routes without adequate hearing and notice can result in potential violations of federal law." Defs.' Ex. E, Doc. No. 86-6. Taken in context, those statements leave no doubt that Drew accused Chiaravallo—and not merely MAT—of possible violations of federal law.[3]

Turning next to the letter of June 27, also shared with local and state officials, Drew begins by claiming that "the City and State recently became aware of a whole host of financial and management concerns with MAT" and then threatens to withhold MAT's funding unless Chiaravallo tenders his immediate resignation. Defs.' Ex. F, Doc. No. 86-7. Drew goes on to suggest that he owes a duty "to protect our citizens, including some of our most vulnerable ones." *Id.* Again, no inferential leap is required to conclude that Chiaravallo is being accused of serious financial mismanagement; for a career administrator, those allegations clearly "go to the very heart" of his professional competence. *Huntley*, 543 F.2d at 985; *see also Scaife v. City of Meriden,* 493 F. Supp. 3d 1, 20 (D. Conn. 2020) (statements that city manager "sowed discord" could "easily erect significant roadblocks to Plaintiff's ability to serve in other senior positions in municipal government").

---

[3] In light of the fact that the record contains a copy of the letter, Chiaravallo's inability to recall Drew's specific statements during his deposition is not relevant to my analysis.

Drew's comments at the public meeting of the COG also stand out. The synopsis of that meeting reflects that Drew informed those present that MAT was in "an extraordinarily precarious financial position" and had improperly "maxed out their half a million dollars credit line" to make up for deficits. Pl.'s Ex. N, Doc. No. 98-15. He additionally suggested that the MAT Administrator, among others, had offered inconsistent explanations for the financial crisis. *Id.* After detailing a litany of concerns regarding MAT's financial management, he explained that he had demanded that the MAT Administrator resign or be removed by vote of the Board. *Id.* Those public allegations of financial mismanagement, closely followed by a demand for Chiaravallo's resignation, could clearly be understood to denigrate Chiaravallo's professional reputation.[4]

Chiaravallo has additionally set forth sufficient evidence to at least "raise the falsity of these stigmatizing statements as an issue." *Segal*, 459 F.3d at 212 n.5. In particular, Chiaravallo submits copies of correspondence with Drew dating back to November 2016 describing the effect of state funding cuts on MAT's budget, and warning that service cuts were likely. Pl.'s Ex. A, Doc. No. 98-2. He additionally provides that he met with Drew on multiple occasions prior to implementing service cuts and shared information regarding MAT's financial situation and the possibility that cuts might be implemented. Pl.'s Ex. R, Doc. No. 98-19. Finally, he submits a letter sent to Drew warning him of service cuts before those cuts were publicly announced.[5] Pl.'s Ex. D, Doc. No. 98-5.

---

[4] I agree with the defendants that the press release and Facebook post, however, do not reference either Chiaravallo or the MAT Administrator with any specificity. Further, although Chiaravallo points to comments Drew made about MAT's financial crisis at press conferences and public meetings, it is not clear from Drew's deposition testimony (or other record evidence) precisely what was said on those occasions. Accordingly, I do not consider the press release, Facebook post or those statements at public meetings in my analysis.

[5] Although the defendants rely heavily on Chiaravallo's failure to recall whether he informed Drew of specific service cuts during his deposition, record evidence establishes that at least some of the cuts were shared with Drew in Chiaravallo's letter of May 12. Pl.'s Ex. D, Doc. No. 98-5. Further, whether or not Chiaravallo informed Drew of every specific cut is not the dispositive question. The issue is instead whether Chiaravallo has set forth sufficient

Further, Chiaravallo has set forth sufficient evidence to demonstrate at least a genuine dispute of material fact with respect to the truth of Drew's claims that MAT's financial troubles were the result of financial mismanagement or impropriety. Specifically, his declaration and letters sent to Drew, state legislators, the FTA and the DOT detail the impact of statewide funding cuts on MAT's budget. Pl.'s Ex. R, Doc. No. 98-19; Ex. A, Doc. No. 98-2; Ex. B, Doc. No. 98-3; Ex. C, Doc. No. 98-4, Ex. E, Doc. No. 98-6. He has also submitted evidence to counter Drew's claim that the cuts were implemented in violation of federal law, stating in his declaration that prior to implementing any cuts, he "spoke with the Federal Transit Administration and confirmed that [MAT] had followed proper procedures." Pl.'s Ex. R, Doc. No. 98-19 at ¶ 27.

Chiaravallo has also set forth evidence to support his claim that Drew's statements impacted his ability to find employment in his chosen field. In his declaration, Chiaravallo avers that, since his termination, he has been unable to "secure comparable employment as a senior manager or administrator in the field of public transportation…[s]ince I was terminated from my employment at MAT, the only job I held was a part-time position as an educational assistant at Albertus Mag[n]us College." *Id.* at ¶ 48. Despite the defendants' arguments to the contrary, the fact that Chiaravallo has been able to secure *some* employment is not dispositive. *See Donato*, 96 F.3d at 632 ("[i]t is of little consequence to our analysis that appellant is not foreclosed from finding employment in some other line of work…[d]ue process protects the freedom to engage in <u>any</u> of the common occupations of life") (cleaned up) (emphasis in original). Rather, the focus

---

evidence to create a genuine dispute of material fact with regard to the truth of Drew's statements that the defendants were afforded no warning about MAT's financial crisis or intent to cut service until constituents complained. *Segal*, 459 F.3d at 212 n.5. In my view, Chiaravallo has met that burden.

of the inquiry under the Fourteenth Amendment is whether Chiaravallo has demonstrated that the statements impacted his ability to pursue his profession in his chosen field.

In a footnote in their memorandum in support of summary judgment, the defendants additionally appear to challenge Chiaravallo's stigma-plus claim on the basis that the defendants "possessed neither hiring nor firing authority over [Chiaravallo]." Defs.' Mem. Doc. No. 86-1 at 17 n.4. To the extent that the defendants intend to argue that Drew cannot be held liable because he had no power to impose the "plus," the defendants are certainly correct that the Second Circuit in *Velez* ultimately declined to impose liability for imposing a stigma against defendants who did not have authority to order the plaintiff's termination and had no "power to provide process to [her]." *Velez*, 401 F.3d at 93.

But Chiaravallo's claim differs from the claim considered by the Court in *Velez*. Rather than alleging that Drew "imposed a stigma and asked for a plus" by the Board, Chiaravallo sets forth evidence that Drew leveraged control over MAT's funding and contract in order to orchestrate his immediate removal. *See, e.g.,* Pl.'s Ex. G, Doc. No. 86-8 ("at your direction, the Board of Commissioners of Middletown Area Transit has terminated the employment of Mr. Chiaravallo."); Pl.'s Ex. F, Doc. No. 86-7 (warning that unless the conditions outlined in his letter, including Chiaravallo's resignation or removal, were met, he would "not renew MAT's contract or release your funds and I hold open the option of the City's withdrawal from MAT as well."). In my view, a reasonable juror could rely upon that evidence to find that Drew both imposed the stigma and effectuated (if somewhat indirectly) the plus. That authority over the termination process therefore distinguishes the case at bar from *Velez*. *See also Walker v. Fitzpatrick,* 814 F. App'x 620, 625 (2d Cir. 2020) ("[plaintiff's] claim for damages based on her alleged loss of a protected liberty interest without due process of law cannot lie against

24

defendants who had neither the power to provide process to her nor *the power to inflict the deprivation*.") (emphasis added).

2.    Due Process

Demonstrating that stigmatizing statements were made in conjunction with loss of employment, however, is only half the battle. In order to implicate the Fourteenth Amendment, a plaintiff must also "demonstrate that [his or her] liberty was deprived without due process of law." *Segal*, 459 F.3d at 213. Due process is a somewhat flexible concept, but "[t]he fundamental requirement…is that an individual be given the opportunity to be heard at a meaningful time and in a meaningful manner." *Patterson*, 370 F.3d at 336 (cleaned up). To evaluate the constitutional sufficiency of the process afforded in connection with a deprivation of a protected liberty interest, a court must consider "(1) the nature of the interest affected by the official action; (2) the government's interest; and (3) the risk of error and the effect, if any, of additional safeguards." *Id.* (citing *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976)). Applying that balancing test in the context of discharge from at-will government employment in *Segal*, the Second Circuit held that due process will generally mandate only "an adequate, reasonably prompt, post-termination name-clearing hearing." 459 F.3d at 214.  Because the core of a due process claim is not the underlying constitutional deprivation but instead the lack of adequate procedural protections afforded in conjunction with that deprivation, the availability of a constitutionally adequate hearing will "defeat a plaintiff's stigma-plus claim." *Patterson*, 370 F.3d at 335.

No bright-line rules govern the procedures that must be followed in order for such a hearing to be constitutionally adequate. Factors that may be relevant to that determination include: the extent to which a plaintiff receives prior notice of the hearing; the availability of an advocate during the hearing; the opportunity to call witnesses; the promptness of the hearing; and

the opportunity to *publicly* address the charges raised. *See, e.g., Segal,* 459 F.3d at 216;

*Patterson*, 370 F.3d at 337; *Abelli v. Ansonia Bd. of Educ.*, 987 F. Supp. 2d 170, 179-80 (D.

Conn. 2013) (post-deprivation hearing constitutionally adequate where plaintiff was "heard

publicly," could call witnesses and present evidence).

     Here, the defendants argue that even if Drew's actions infringed on a constitutionally

protected liberty interest, Chiaravallo was afforded adequate due process in conjunction with his

termination. According to the defendants, Chiaravallo was provided notice of Drew's concerns in

the letter of June 9; he was then warned of the possibility that he might be terminated in the letter

of June 27. Defs.' Mem., Doc. No. 86-1 at 21. The subsequent meeting on June 29 functioned as

a termination hearing during which Chiaravallo had "an opportunity to speak about the claims

laid out in Defendant Drew's letter." *Id.* at 22.

     Chiaravallo disputes that narrative, maintaining that the hearing afforded was not merely

constitutionally inadequate, but that no hearing actually took place. According to Chiaravallo,

the meeting of June 29 was instead simply a Board meeting convened to address Drew's

demands and coordinate a response. Pl.'s Ex. R, Doc. No. 98-19 at ¶ 46. Chiaravallo additionally

maintains that even if the meeting on June 29 can be classified as a hearing, he was entitled to

notice and an opportunity to be heard *before* Drew made the objectionable statements. Pl.'s

Mem., Doc. No. 98 at 21.

     As an initial matter, although not directly addressed in either party's memoranda, it

appears from the record that Chiaravallo was an at-will employee; he claims no entitlement to

for-cause or similar removal protections.[6] Although precedent in this Circuit has been less than

consistent with regard to the process that must be afforded to an at-will employee, the *Segal*

---

[6] At oral argument, plaintiff's counsel indicated that he thought Chiaravallo was an at-will employee but could not say so with certainty.

Court clarified that, in the context of at-will employment, a *post*-deprivation hearing will generally satisfy due process requirements. *Segal*, 459 F.3d at 214 (emphasis added).[7] But even assuming that Chiaravallo was entitled only to a post-deprivation name-clearing hearing, I am not persuaded that due process has been afforded here.

First, although the defendants repeatedly refer to the June 29 meeting as a hearing, the evidence with respect to what took place on June 29 is conflicting.[8] According to Chiaravallo, that meeting involved "no discussion about any of my actions that I had taken as MAT Administrator, such as my actions to cut service, or relating to any of the financial or management issues claimed by Drew." Pl.'s Ex. R, Doc. No. 98-19 at ¶ 46. Moreover, although the defendants rely heavily on Chiaravallo's deposition testimony to argue that Chiaravallo was afforded a meaningful opportunity to be heard, his testimony is fairly ambiguous. Chiaravallo indicates only that he had "an opportunity to express how I felt" and "said what I had to say." Defs.' Ex. A, Doc. No. 86-2 at 163-64. Accordingly, even if that meeting can be understood to function as a hearing, there is no indication that Chiaravallo was afforded a meaningful opportunity to rebut the charges leveled against him, much less to call or cross-examine witnesses or obtain any sort of representation by an advocate. *Segal*, 459 F.3d at 216.

Considered in light of Chiaravallo's significant "reputational interest, and how that interest could effect his standing in the community and his future job prospects," the absence of clear procedural protections is significant. *Patterson*, 370 F.3d at 336. Further, the lack of

---

[7] Although the *Segal* Court did not consider a due process claim against a high-ranking official, it drew no distinction on the basis of the status of the defendant. *See also Spang v. Katonah-Lewisboro Union Free Sch. Dist.*, 626 F. Supp. 2d 389, 397 (S.D.N.Y. 2009) (applying *Segal* to hold that a post-deprivation hearing satisfied due process in the context of at-will employment despite claim that defendant official was "high ranking official").
[8] Following oral argument, the defendants also submitted the Agenda and Minutes from the June 30 Special Meeting of the MAT Board of Directors. To the extent that the defendants attempt to argue that the June 30 meeting functioned as a name-clearing hearing—as opposed to the June 29 meeting identified in their brief—that agenda item alone does not demonstrate that Chiaravallo was afforded a meaningful opportunity to be heard. Further, Chiaravallo maintains that he was not present at that meeting. Pl.'s Ex. R, Doc. No. 98-19 at ¶ 47.

opportunity afforded Chiaravallo to "defend himself fully against all of the allegations made" increased the risk that those charges would "go unrefuted and that [Chiaravallo's] name [would] remain stigmatized." *Id.* at 337. Finally, although the City's interest in quickly addressing issues affecting public transportation is, of course, important, there is no indication that permitting Chiaravallo an opportunity to respond to Drew's allegations *after* he was removed from his role as Administrator would be unduly burdensome.[9] *Segal*, 459 F.3d at 216.

Viewing the record evidence in the light most favorable to Chiaravallo, there is at least a genuine dispute of material fact with regard to whether Chiaravallo was afforded constitutionally adequate process in conjunction with his termination. Summary judgment on Chiaravallo's due process claim against Drew and the City is therefore denied.

B.    Qualified Immunity

The defendants argue in the alternative that, even if Chiaravallo has stated a cognizable due process claim against Drew, Drew is entitled to qualified immunity. Properly invoked, qualified immunity operates to shield state officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Because it is an affirmative defense, the burden of demonstrating that qualified immunity applies rests with a defendant. *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011). In order to meet that burden, a defendant must show either that "[1] the defendant's action did not violate clearly established law, or [2] it was objectively reasonable for the defendant to believe that his action

---

[9] In their reply to Chiaravallo's memorandum in opposition to the motion for summary judgment, the defendants additionally claim that, at oral argument on the motion to dismiss, Chiaravallo rejected the opportunity for a second name-clearing hearing. Defense counsel, however, agreed that a hearing *at this point* would not be of use. Trans. of Hrg. on Mot. to Dismiss, Doc. No. 62 at 5.

did not violate such law." *Garcia v. Doe*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007)).

A right is clearly established where "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The right must be evaluated in the context of Supreme Court and Second Circuit precedent "as it existed at the time of the challenged conduct." *McGowan v. United States*, 825 F.3d 118, 124 (2d Cir. 2016). Nonetheless, "the absence of a decision by [the Second Circuit] or the Supreme Court directly addressing the right at issue will not preclude a finding that the law was clearly established so long as preexisting law clearly foreshadows a particular ruling on the issue." *Id.* (quoting *Garcia*, 779 F.3d at 92). The focus of the inquiry is instead whether "existing precedent…placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Moreover, the question is not what a "lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." *McCullough v. Wyandanch Union Free School District*, 187 F.3d 272, 278 (2d Cir. 1999).

Even if a court determines that a right is clearly established, qualified immunity will protect a government official "if it was objectively reasonable for the official to believe that his acts did not violate those rights." *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000) (quoting *Russell v. Coughlin*, 910 F.2d 75, 78 (2d Cir. 1990)). The question is "not whether the [official] should have acted as he did…[i]t is instead whether *any* reasonable [official], out of the wide range of reasonable people…*could have* determined that the challenged action was lawful." *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (emphasis in original). The determination of whether conduct was "objectively reasonable…is a mixed question of law and fact."

*Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004). Accordingly, if there is a dispute with regard to the "material historical facts" in a particular case "the factual questions must be resolved by the factfinder." *Id.; see also Mickle v. Morin*, 297 F.3d 114, 122 (2d Cir. 2002) (if "the circumstances are in dispute and contrasting accounts present factual issues as to the [alleged conduct of the defendant] and its reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity") (cleaned up).

Here, the defendants maintain that even if Drew's statements were sufficiently stigmatizing to implicate a protected liberty interest, there was no clearly established precedent dictating that they met that high standard. Further, because Drew did not have direct hiring and firing authority over Chiaravallo, it was objectively reasonable for him to believe that he owed no duty to afford Chiaravallo any sort of due process prior to demanding his removal. Finally, the defendants contend, Chiaravallo *was* afforded a hearing prior to his termination, and it was therefore objectively reasonable for Drew to believe that no additional process was due.

As an initial matter, the law establishing that statements impugning a professional's competence may entitle that professional to notice and an opportunity to be heard is far less murky than the defendants suggest. The Supreme Court made clear as early as 1972 that statements that might "seriously damage [a plaintiff's] standing and associations in [the] community," when made in conjunction with more concrete loss, may implicate a protected liberty interest and entitle a plaintiff to due process protection. *Roth*, 408 U.S. at 573. As early as 1976, in *Huntley*, the Second Circuit interpreted Supreme Court precedent to hold that statements that "go to the very heart of [an employee's] professional competence" may implicate a liberty interest when made in conjunction with a termination. 543 F.2d at 985; *see also Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 447 (2d Cir. 1980) ("A subtle campaign

designed by city officials to make plaintiff the scapegoat for an episode of municipal misfeasance may impose no less an indelible stigma than a public proclamation announced at high noon from the steps of City Hall."). Accordingly, at the time of Chiaravallo's dismissal, the right to notice and an opportunity to be heard to rebut charges of professional incompetence made in conjunction with termination from government service was clearly established.

With regard to objective reasonableness, the defendants first contend that it was reasonable for Drew to believe that he owed no duty to afford Chiaravallo due process because he did not have "hiring and firing authority" over Chiaravallo. Defs.'Mem., Doc. No. 86-1 at 26. As discussed, however, Chiaravallo has set forth evidence from which a reasonable juror could conclude that Drew *did* have the authority to effectuate Chiaravallo's immediate removal. In light of that control over the termination process, I cannot determine at this stage of the proceedings that "no reasonable jury…could conclude that it was objectively unreasonable" for Drew to determine that he had no duty to afford Chiaravallo some type of hearing in conjunction with his termination. *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999).

Finally, factual disputes necessary to the "resolution of whether qualified immunity is a bar" remain. *Cartier v. Lussier*, 955 F.2d 841, 844 (2d Cir. 1992). The defendants' argument that Drew is entitled to qualified immunity rests heavily on the claim that it was objectively reasonable for Drew to believe that no additional process was due because Chiaravallo was provided a meaningful pretermination hearing. However, there is conflicting evidence in the record with regard to whether any sort of hearing took place, much less whether that hearing met constitutional standards. Because any determination regarding the objective reasonableness of Drew's conduct depends on the resolution of that factual dispute, a decision that he is entitled to

qualified immunity would be premature at this stage of the proceedings.[10] *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995); *see also Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994) ("Though immunity ordinarily should be decided by the court, that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required.") (cleaned up).

C.    Section 1983 Claim Against the City of Middletown

The defendants additionally contend that even if Drew's conduct rose to the level of a constitutional violation, the City cannot be held liable for his actions. In *Monell v. Dept. of Social Services*, the Supreme Court held that a municipality could not be held liable under section 1983 "for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. 658, 694 (1978). A plaintiff seeking to recover for a constitutional violation against a municipality therefore cannot rely on a theory of *respondeat superior* but must instead demonstrate that "the municipality was the moving force behind the injury alleged." *Agosto v. New York City Dept. of Education*, 982 F.3d 86, 98 (2d Cir. 2020) (cleaned up) (quoting *Bd. of Cty. Comm'rs of Bryan City., Okla. v. Brown*, 520 U.S. 397, 404 (1997)). To make that showing, a plaintiff must establish that "the municipality violated a federally protected right through (1) municipal policy, (2) municipal custom or practice, or (3) the decision of a municipal policymaker with final policymaking authority." *Zherka v. DiFiore*, 412 F. App'x 345, 348 (2d Cir. 2011).

---

[10] Moreover, to the extent that the defendants would be prepared to accept Chiaravallo's version of events as true—i.e., that Drew orchestrated his removal and failed to afford him any opportunity to respond to charges of financial mismanagement or impropriety following that removal—the inapplicability of qualified immunity as a defense is obvious.

Final policymaking authority requires a showing that "a deliberate choice to follow a course of action [was] made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). "Even a single action by a decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered may deprive the plaintiff of his or her constitutional rights." *Montero v. City of Yonkers*, 890 F.3d 386, 403 (2d Cir. 2018) (cleaned up). A mere grant of discretionary authority, however, does not equate to final policymaking authority; if "a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). "An official has final authority if his decisions, at the time they are made, 'may fairly be said to represent official policy.'" *Roe v. City of Waterbury,* 542 F.3d 31, 37 (2d Cir. 2008) (quoting *McMillian v. Monroe County, Alabama,* 520 U.S. 781, 784 (1997). Determining "[w]hether a particular official is a final policymaker is a question of state law to be decided by the trial court." *Kimble v. Kingston City School District*, 792 F. App'x 80, 81 (2d Cir. 2019) (cleaned up). "[T]he critical inquiry is not whether an official has general policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." *Roe*, 542 F.3d at 37.

Pointing to Drew's threats to impound the City's funds until the Board effectuated Chiaravallo's termination, and Drew's testimony that he did so in his role as "custodian of the city's financial resources," Chiaravallo maintains that Drew wielded final policymaking authority with respect to his removal. Pl.'s Ex. J, Doc. No. 98-11 at 142: 20-21. Further, Chiaravallo points out, MAT formalized Chiaravallo's termination in a written resolution drafted

by the City of Middletown General Counsel, acting in his official capacity, and the defendants concede that following Chiaravallo's termination, the City "adopted and ratified" Drew's statements. L. R. 56(a)(1) Stmt. at ¶ 41. Accordingly, Chiaravallo maintains, Drew's decisions constituted the City's final decisions.

The defendants dispute that claim, arguing instead that it clear from the record that only MAT had final authority to effectuate Drew's termination. Further, relying on the Charter for the City of Middletown, they maintain that control over the City's annual budget is ultimately committed to the Middletown Common Council, and not the Mayor. Because any actions taken with regard to MAT's funds were therefore subject to review by the Common Council, and there is no evidence of participation by the Common Council in the termination decision, the City cannot be held liable for Drew's actions. In support of that argument, the defendants rely heavily on *Legal Aid Society v. City of New York*, a case addressing a claim against the City of New York arising in part out of the Mayor's threats to cancel city contracts with the Legal Aid Society (a legal services provider). 114 F. Supp. 2d 204, 210 (S.D.N.Y. 2000). After analyzing the provisions of the Charter of the City of New York, the *Legal Aid* Court held that the City could not be held liable for the actions of the individual defendants because "any budgetary proposals submitted by the Mayor are ultimately subject to plenary review by the City Council" and the City Council therefore retained final policymaking authority with respect to the municipal contract budget. *Id.* at 232.

As previously discussed, although the MAT Board retained the exclusive authority to *finalize* Chiaravallo's termination, Chiaravallo has set forth sufficient evidence to demonstrate that Drew orchestrated his removal by impounding MAT's funds. Further, although I agree with the defendants that the City Charter is the appropriate starting point for determining the source of

policymaking authority, that Charter provides less useful guidance than the defendants suggest.

Although the Charter clarifies that the Common Council retains final authority "to adopt a

budget for each fiscal year…[and] to appropriate such funds as may be required for the proper

conduct of the City's business," it does not address the source of authority over MAT's annual

subsidies. Middletown City Charter, Ch. III, § 4. With respect to the scope of the Mayor's

authority, the Charter provides that the Mayor "shall be the chief executive officer of the City"

and "shall be directly responsible for the administration of all Departments, Agencies and

Offices." *Id.* at Ch. IV, § 2. Although the Mayor must propose an annual budget to the Common

Council and may veto any alterations to that budget made by the Council, the Council may

override that veto by a two-thirds vote. *Id.* at Ch. VI, § 1; Ch. IV, § 2. The Charter provides no

detail, however, with respect to the power of the mayor to impound funds authorized for a

particular purpose, distinguishing it from the Charter considered in *Legal Aid*. Further, although

the Charter commits authority to the Mayor to "sign contracts approved by the Common

Council," the Charter offers no clarity with respect to the Mayor's authority to repudiate or

refuse to sign a particular contract. *Id.* at Ch. IV, § 2.

In my view, despite the lack of clarity afforded by the provisions of the Charter,

Chiaravallo has met his burden to demonstrate that Drew's actions represented the official policy

of the City. In particular, in his letter of June 27, Drew warns "[a]lthough MAT is a separate

entity entirely from the City…we do have a contract with MAT and we spend substantial

taxpayer dollars on MAT. Your contract is currently on my desk for renewal…I will not renew

your contract or release your funds, and I hold open the option of the City's withdrawal from

MAT as well." Pl.'s Ex. F, Doc. No. 86-7. Describing the City's purported discovery of MAT's

financial crisis at the COG meeting, Drew similarly told those present:

Our top concern is making sure that service continues and the only real leverage we have is that we start to explore what authority we have legally to withhold our funds in exchange for the conditions we require in order for the release of our funds and that's where we are today.

Pl.'s Ex. N, Doc. No. 98-15. In his affidavit, Drew further provides that he informed Chiaravallo that he "would not sign the City's contract to release funds to MAT" until his demands were met. Pl.'s Ex. C, Doc. No. 86-4 at ¶ 11. Finally, the defendants do not dispute that MAT formalized "its termination of [Chiaravallo] in a written resolution drafted by the City's General Counsel, Brigham Smith, acting in his official capacity as General Counsel for the City, as directed by Drew." L. R. 56(a)(2) Stmt. at ¶¶ 40-41. That resolution reads, in relevant part: "[t]he Mayor will release the funds when the Resolution is passed." Min. of MAT Bd Special Mtg.

Those statements offer strong support for Chiaravallo's claim that Drew's actions could "fairly be said to represent official policy." *Roe*, 542 F.3d at 37 (quoting *McMillian v. Monroe County, Alabama,* 520 U.S. 781, 784 (1997)); *see also Rookard v. Health & Hospitals Corp.,* 710 F.2d 41, 45 (2d Cir. 1983) ("[a]n official has final authority if his decisions, at the time they are made, for practical or logical reasons constitute the municipality's final decisions."). Especially in light of the authority committed to the Mayor to sign contracts on behalf of the City, those statements suggest that Drew spoke with final policymaking authority in effectuating Chiaravallo's immediate removal as Administrator of MAT on the basis of purported financial mismanagement. *See, e.g., Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (municipal liability may attach where "the governmental official is a final policymaker for the local government in a particular area, or on the particular issue involved in the action") (cleaned up). Accordingly, although the question is somewhat close, Chiaravallo has met his burden to demonstrate that the constitutional deprivation at issue was inflicted by "those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694.

D.     State-Law Claims

1.     Defamation

Defamation is a catch-all term that both encompasses libel (written defamation) and

slander (oral defamation). *Gambardella v. Apple Health Care, Inc.*, 86 Conn. App. 842, 850

(2005). Under Connecticut law, "[a] defamatory statement is defined as a communication that

tends to harm the reputation of another as to lower him in the estimation of the community or to

deter third persons from associating or dealing with him." *Cweklinsky v. Mobil Chemical Co.*,

267 Conn. 210, 217 (2004). A cognizable claim for defamation requires a showing that: (1) the

defendant made a defamatory statement; (2) the defamatory statement identified the plaintiff to a

reasonable third person; (3) the defamatory statement was published to a third person; and (4) the

plaintiff's reputation suffered injury as a result of the defamatory statement. *Qsp, Inc. v. Aetna*

*Casualty & Surety Co.*, 256 Conn. 343, 356 (2001). Statements of opinion, even if negative or

otherwise harmful, cannot, as a matter of law, form the basis for a defamation claim.

*Johnson v. Chesebrough-Pond's USA Co.*, 918 F. Supp. 543, 551-52 (D. Conn. 1996). Although

a defamatory statement must be false in order to meet the standard, "determination of the

truthfulness of a statement is a question of fact for the jury." *Gleason v. Smolinski*, 319 Conn.

394, 431 (2015) (cleaned up).

Here, for substantially the same reasons discussed in conjunction with Chiaravallo's

constitutional claim, certain of Drew's statements—specifically, those alleging that Chiaravallo's

actions may have violated federal law, that he had withheld information regarding MAT's

financial circumstances from the City and had engaged in financial mismanagement—are

sufficiently defamatory in that they clearly could have harmed Chiaravallo's professional and

personal reputation. Further, Chiaravallo has set forth evidence to create at least a genuine dispute of material fact with regard to whether those statements were false.

My determination that Chiaravallo has adequately alleged that Drew made defamatory statements, however, is not the end of the matter. Even where a plaintiff has adequately pleaded defamation under state law, "there are numerous federal constitutional restrictions that govern the proof of the tort of defamation, the applicability of which varies with (a) the status of the plaintiff as a public or private figure, and (b) whether the subject of the speech is a matter of public or private concern." *Gleason,* 319 Conn. at 431. A public figure, or one who "has, or appears to the public to have, substantial responsibility for or control over the conduct of government affairs," must demonstrate that a defamatory statement was made "with actual malice.". *Moriarty v. Lippe*, 162 Conn. 371, 378-79 (1972). Actual malice requires a showing that a statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964); *see also Woodcock v. Journal Publ'g Co.*, 230 Conn. 525, 537 (1994) ("at a minimum, actual malice requires that there 'be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication'") (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). "Whether a defendant has knowledge of the falsity of a defamatory statement is a question within the province of the trier of fact." *Gambardella*, 291 Conn. at 638.

Although neither party in the case at bar briefs the issue in detail, the parties appear to agree that Chiaravallo qualifies as a public figure and therefore cannot recover on his claim for defamation absent a showing of actual malice. But even assuming that stringent standard governs, Chiaravallo has proffered sufficient evidence to overcome summary judgment with respect to at least some of Drew's statements. In particular, although Drew's letters accuse

Chiaravallo of failing to inform the City of service cuts or MAT's financial situation, record evidence demonstrates that Chiaravallo shared information about the burgeoning crisis with Drew on multiple occasions and informed him about some of the proposed service cuts prior to their implementation. See Pl.'s Ex. A, Doc. No. 98-2; Ex. D, Doc. No. 98-5; Ex. R, Doc. No. 98-19. Further, although Drew's statements attributed MAT's financial crisis to mismanagement, Chiaravallo has set forth evidence that the source of MAT's financial crisis was statewide funding cuts and that he repeatedly informed Drew that those cuts had brought MAT to the verge of financial insolvency. *Id*. In my view, a reasonable juror could therefore find allegations that Chiaravallo had engaged in financial mismanagement and failed to inform the City about MAT's financial crisis were made with at least reckless disregard to the truth of those statements.[11] Accordingly, summary judgment is denied with respect to the claim for defamation.

2.     Intentional Interference with an Advantageous Business Relationship

Under Connecticut law, "[t]he elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc*., 255 Conn. 20, 27 (2000). Unlike other actions sounding in tort "in which liability gives rise to nominal damages even in the absence of proof of actual loss…it is an essential element of the tort of unlawful interference with business relations that the plaintiff suffered actual loss." *American Diamond Exchange, Inc. v. Alpert*, 302 Conn. 494, 510

---

[11] With respect to Drew's statements that service cuts were implemented in violation of federal law, however, the question is much closer. Although Chiaravallo has set forth evidence that the cuts were implemented in compliance with federal law, he has failed to point to anything in the record suggesting that Drew was *aware* that those statements were false. Accordingly, Chiaravallo has failed to meet his burden in demonstrating that those particular statements were made with at least reckless disregard for their truth.

(2011) (cleaned up). In addition, a plaintiff must demonstrate not only interference but *tortious* interference, or "plead and prove at least some improper motive or improper means." *Daley v. Aetna Life & Cas. Co.*, 249 Conn. 766, 806 (1999). The interference must be "wrongful by some measure beyond the fact of the interference itself." *Blake v. Levy*, 191 Conn. 257, 262 (1983) (cleaned up).

It is only the last element—improper means or motive—that is in dispute in the case at bar. Pointing to Drew's 2017 announcement of a campaign for state governor, Chiaravallo maintains that a reasonable juror could easily find that Drew acted to elevate his own political stature by blaming Chiaravallo for MAT's dire financial straits and the associated unpopular service cuts. But as the defendants point out, Chiaravallo sets forth no evidence in support of that narrative other than demonstrating that Drew officially announced his candidacy for the governorship and filed paperwork to that effect with the State Elections Enforcement Commission on July 12, 2017. *See* Pl.'s Ex. Q, Doc. No. 98-18. In my view, the mere fact that Drew had gubernatorial ambitions does not demonstrate that he acted with an improper motive in demanding Chiaravallo's termination.

Accordingly, Chiaravallo has failed to meet his burden in demonstrating that Drew acted with improper motive or improper means by threatening to withhold funding if MAT refused to terminate Chiaravallo from his position. Summary judgment is therefore granted with respect to the claim for intentional interference with a business relationship.

3.   <u>False Light Invasion of Privacy</u>

Connecticut has adopted the definition of false light invasion of privacy provided by the Restatement (Second) of Torts, recognizing that liability may be imposed where a defendant "gives publicity to a matter concerning another that places the other before the public in a false

light…if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Grossman v. Computer Curriculum Corp.*, 131 F. Supp. 2d 299, 311 (D. Conn. 2000) (quoting Restatement (Second), Torts § 652A (1977)). The statements themselves must be false; moreover, they must be "such a major misrepresentation of [a plaintiff's] character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position." *Jonap v. Silver*, 1 Conn. App. 550, 558 (1984) (cleaned up). Generally, "[w]hether the matter communicated to the public would be highly offensive to a reasonable person sufficient to support a false light claim presents a question of fact for the trier of fact." *Chernovetz v. Harries*, 2021 Conn. Super. LEXIS 648, at *11-12 (Super. Ct. Apr. 27, 2021). (cleaned up).

Although the elements of a claim for false light invasion of privacy largely overlap with those required to state a claim for defamation, defamation requires merely that the offending statements be "communicat[ed] by the defendant to a third person." *Handler v. Arends*, 1995 Conn. Super. LEXIS 660, at *20-21 (Super. Ct. Mar. 1, 1995) (quoting 3 Restatement (Second), Torts § 652D, comment (a) (1971)). To recover under a theory of false light invasion of privacy, however, a plaintiff must show that the matter was made public, either to the "public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id.* at 20. In the employment context specifically, "courts have determined that when information is conveyed only to employees with a duty, responsibility and a need for such information there is not sufficient publicity to support an action for invasion of privacy." *Grossman*, 131 F. Supp. 2d at 311-12 (cleaned up).

Here, allegations that Chiaravallo engaged in financial mismanagement and failed to inform the City regarding MAT's financial circumstances in dereliction of his duty as Administrator could be found "highly offensive" by a reasonable juror; as discussed, there is also evidence to suggest that those statements were made with at least "reckless disregard as to the falsity of the publicized matter." *Pace v. Bristol Hosp.*, 964 F. Supp. 628, 630 (D. Conn. 1997) (quoting 3 Restatement (Second) Torts § 652E (1977)).

Moreover, those statements were made in two letters sent to the Board and copied to various state and local legislators, as well as at a public COG meeting. *See* Defs.' Ex. F, Doc. No. 86-7; Ex. E, Doc. No. 86-6; Pl.'s Ex. N, Doc. No. 98-15. The defendants additionally do not dispute that those letters were ultimately "reported in the news media." Pl.'s Ex, R Doc. No. 98-19 at ¶ 45. In my view, Chiaravallo has therefore met his burden to present evidence from which a reasonable jury could find that those "communications…reache[d] or [were] sure to reach, the public at large." *Handler*, 1995 Conn. Super. LEXIS 660, at *24; *see also Holmes*, 866 F. Supp. 2d at 132 (publicity element met where "meeting at which [objectionable] statements were made was aired multiple times on public access television"); *Blue v. Carbonaro*, 2015 Conn. Super. LEXIS 1093, at *25 (Super. Ct. May 11, 2015) ("any…statement made in an address to a large audience, is sufficient to give publicity within the meaning of the term as it is used in this cause of action") (cleaned up). Accordingly, summary judgment is denied with respect to the claim for false light invasion of privacy.

## V.    Conclusion

For the foregoing reasons, the defendants' motion for summary judgment is **granted** in part and **denied** in part.

Dated at Bridgeport, Connecticut, this 22nd day of September 2021.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge